Filed 11/25/24  P. v. Lopez CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JAVIER LOPEZ,<br><br>    Defendant and Appellant. | G062615<br><br>(Super. Ct. No. 12NF0846)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Lance P. Jensen, Judge. Affirmed.

Matthew A. Lopas, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

\*        \*        \*

On February 15, 2022, Javier Lopez filed a petition seeking to vacate his murder conviction under former Penal Code section 1170.95 (now Pen. Code, § 1172.6).[1]  In 2023, after presiding over an evidentiary hearing, the trial court denied the petition.

In this appeal, appointed appellate counsel filed a brief raising no arguable issues.  (See *People v. Delgadillo* (2022) 14 Cal.5th 216, 230 (*Delgadillo*); *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).)  Lopez was offered the opportunity to submit a supplemental brief, and did not do so.

In the interests of justice, this court has independently reviewed the record and found no arguable issues.  (See *Delgadillo*, *supra*, 14 Cal.5th at p. 230 ["if the appellate court wishes, it may also exercise its discretion to conduct its own independent review of the record in the interest of justice"].)  As a result, we affirm the trial court's denial of Lopez's petition.

STATEMENT OF FACTS[2]

On the evening of March 16, 2012, Juan Morales and his friend Angel Bravo Gonzalez were celebrating Morales' birthday at Gonzalez's apartment in Anaheim near the corner of Juno and Roberts Avenues. Around 1:00 a.m. (by this point, on March 17, 2012), Morales asked Gonzalez for a ride home. Morales had been drinking, but according to Gonzalez, he was in a happy mood and was still able to walk and function normally.

Morales went outside first, and began hitting a tree in front of the apartment with an object. One witness testified Morales was swinging a

[1] Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10); all further undesignated statutory references are to the Penal Code.

[2] The facts in this section are gleaned from the trial transcripts, which the trial court reviewed in making its decision.

2

bat at the tree. To this witness, he seemed intoxicated and like he was "screwing around." However, Gonzalez said he and his roommate kept an ax by the front door for protection, and Morales was playfully hitting the tree with that. He said he told Morales to put the ax back, as the two were preparing to leave. Morales complied.

They were starting toward the car when they heard several people yelling from an apartment across the street. Several witnesses reported hearing men yell "'Westside'" or "'This is Westside'" at Morales.[3] A group of men came up to Gonzalez and Morales, upset and angry. Gonzalez did not know any of them. The men all appeared to be approximately in their thirties.

Gonzalez said Morales was about 10 feet in front of him, and he heard Morales say something but he could not make out what it was. One witness heard Morales yell back at them, "'F--- Westside.'"

The men began fighting Morales. One witness described a suspect fighting with Morales on the ground, while another suspect walked behind them, pulled out a gun, and fired it at Morales's chest. Another witness told investigators she noticed one of the men was getting beaten up and yelled to his comrade: "'Shoot him mother f-----, shoot him.'"

Morales did not go down immediately and tried to take a swing at the men. Gonzalez tackled the shooter, causing him to drop the gun, and the two ended up on the ground. Gonzalez could feel the shooter's cohorts hitting him in the stomach and head, including a blow to the back of the head with "something hard." One witness said once Morales fell to the ground, all of the

---

[3] A witness told police that Westside is the gang that claimed the neighborhood.

men began kicking him in the body and head. Gonzalez got up, and the assailants ran off. Gonzalez called the police. Morales passed away soon thereafter.

Gonzalez identified Lopez from a photo lineup as one of the assailants, though not the shooter. The shooter, Jesus Sepulveda, was soon apprehended and also identified Lopez, his good friend, as involved in the fight.

In interviews with police, which were played for jurors at Lopez's trial, Lopez admitted he was there, but that he was only trying to help Sepulveda get out of the fight. He told police he was getting beaten up in the fracas, and he did not know his friend was armed. However, after executing a search warrant on Lopez's home, police discovered a notebook with the words "'One Shot West Heavy Shit.'" Additionally, police discovered multiple phone calls between Lopez and Sepulveda on their cell phones the day after the murder.

PROCEDURAL HISTORY

Both Lopez and Sepulveda were charged with special circumstance murder and street terrorism in the death of Morales, with gang and firearm enhancements. The men were charged with committing murder for the benefit of the Westside Anaheim street gang.

At trial, the prosecution presented testimony from gang experts. These experts testified that both Sepulveda and Lopez were considered active Westside Anaheim street gang members at the time of the murder. They further testified that the area in which the murder occurred was claimed by the Westside Anaheim gang.

Expert witness Trang Pham testified that a gang member would normally place much more significant weight on any confrontational or

4

disrespectful behavior taking place in his own gang's territory. He said gang members view disrespectful behavior toward them and their group a threat to their control over their turf. Having reviewed the interview transcripts in the case, Pham testified that his opinion was that Sepulveda and Lopez had "hit up" Morales, and they had found Morales' response disrespectful. The words "'One Shot West Heavy Shit" written on Lopez's notebook, Pham opined, pertained to Morales' slaying, and was the equivalent of a boast by Lopez.

He further testified that hit-ups often engender a violent confrontation. He said guns are a prized item within gangs which allow members to inflict great damage. As a result, most of the members of the gang will want to know who has a gun so that they can be prepared to use it. As a courtesy, any gang member who is armed would, Pham testified, normally tell his comrades he has a gun.

The court instructed the jury on both direct aiding and abetting and the natural and probable consequences doctrine. Lopez was found guilty of the lesser included offense of voluntary manslaughter and the jury found true the allegation that Lopez committed voluntary manslaughter for the benefit of Westside Anaheim. Lopez was sentenced to 16 years in prison.

In 2022, Lopez filed his petition for resentencing under section 1172.6. The trial court appointed counsel for Lopez, issued an order to show cause, and set the case for an evidentiary hearing.

The trial court denied the petition, finding the record contained "substantial evidence, that is, evidence that is reasonable, credible and of solid value that would support a rational trier of fact, and this court in finding that the People have proved beyond a reasonable doubt that the

defendant is guilty [of] murder under express malice and in the alternative under implied malice under an aiding and abetting theory."

The court noted both defendants were Westside Anaheim gang members and were very close. Given Pham's testimony about gang activity, which the court found persuasive and credible, it found it unreasonable to think Lopez did not know Sepulveda was armed that night. The court also found Lopez was the only other person on scene who could have yelled the instruction to shoot Morales heard by a witness. The court found the witness' testimony of having heard this instruction credible.

On appeal, Lopez's appointed appellate counsel filed an opening brief consistent with the procedures outlined in *Delgadillo*, *supra*, 14 Cal.5th 216 and *Wende*, *supra*, 25 Cal.3d 436. Appellate counsel noted two issues counsel considered but did not argue in the brief:

"1.  Is there substantial evidence to support the trial court's finding of guilt as to murder under the new law? [Citations.]

2.  Did the trial court apply the correct burden of proof when denying the petition after a hearing pursuant to section 1172.6, subdivision (d)? [Citations.]"

Lopez was offered the opportunity to file a supplemental brief, but did not do so.

## DISCUSSION

When a defendant's appointed appellate counsel finds no arguable issues on appeal of the denial of a petition for resentencing under section 1172.6, the appellate court may conduct an independent review of the record to determine if any such issues exist. (See *Delgadillo*, *supra*, 14

6

Cal.5th at p. 230; *Wende, supra*, 25 Cal.3d at pp. 441-442.) In our discretion, we have chosen to conduct such an independent review.[4]

Generally, "an arguable issue on appeal consists of two elements. First, the issue must be one which, in counsel's professional opinion, is meritorious. That is not to say that the contention must necessarily achieve success. Rather, it must have a reasonable potential for success. Second, if successful, the issue must be such that, if resolved favorably to the appellant, the result will either be a reversal or a modification of the judgment." (*People v. Johnson* (1981) 123 Cal.App.3d 106, 109.)

We have reviewed the record on appeal, and agree with counsel that there are no "arguable issues," including the two issues counsel considered and rejected. We find the trial court acted as an independent factfinder, and we find there was substantial evidence to support its conclusion regarding Lopez's liability for Morales' murder. We therefore affirm the trial court's denial of Lopez's petition.

---

[4] In *Delgadillo*, the California Supreme Court held that appellate courts are not required to conduct a full *Wende*-style independent review of the record where counsel files a no-issues brief after denial of a petition for resentencing. (*Delgadillo, supra*, 14 Cal.5th at p. 227.) Lopez's appointed counsel pointed out that, unlike the petitioner in *Delgadillo*, Lopez's petition had passed the prima facie stage, thus making the reasoning of *Delgadillo* inapplicable. As we have decided to do an independent review of the record regardless, we express no opinion on this issue.

## DISPOSITION

The trial court's ruling denying appellant's petition for resentencing under section 1172.6 is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


MOTOIKE, J.


GOODING, J.